UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
CASE NO. 06-61448-CIV-GOLD/MCALILEY

SOUTHERN WASTE SYSTEMS, LLC,
a Florida limited liability company; and
SUN RECYCLING, LLC, a Florida limited
liability company,

      Plaintiffs,

v.

THE CITY OF CORAL SPRINGS, FLORIDA,
a Florida Municipal Corporation; WASTE
MANAGEMENT, INC. OF FLORIDA, a Florida
Corporation, and the BROWARD SOLID WASTE
DISPOSAL DISTRICT, a Florida Dependent
Special District,

      Defendants.

_____ /

**ORDER GRANTING SUMMARY JUDGMENT FOR
DEFENDANTS (OTHER THAN ON CORAL SPRINGS COUNTERCLAIM);
ADMINISTRATIVELY CLOSING THE CASE PENDING APPEAL**

**I. INTRODUCTION**

This matter is before the Court on the following motions: (1) Motion for Summary

Judgment by Defendant City of Coral Springs, Florida ("Coral Springs") **[DE 275]**; (2) Motion

for Summary Judgment by Defendant Waste Management of Florida, Inc. ("Waste

Management") **[DE 281]**; (3) Motion for Summary Judgment by the Broward Solid Waste

Disposal District ("District") **[DE 288]**; (4) Motion for Partial Summary Judgment by Plaintiffs

Southern Waste Systems, LLC ("Southern Waste") and Sun Recycling, LLC's ("Sun") **[DE**

**292]**[1]; (5) Coral Springs' Motion To Strike or Exclude Addendum to Expert Report of Mark P. Berkman **[DE 235]**;[2] (6) Waste Management's Motion to Strike Plaintiffs' Statement of Material Facts **[DE 337]**; and (7) Waste Management's Motions to Strike Affidavit of Charles Lomangino and Anthony Lomangino **[DE 338 and 339]**.[3] I held oral argument on these motions on Friday, January 15, 2010.[4]

## II. <u>SUMMARY OF THE PLEADINGS</u>

The Plaintiffs have filed a three-count Third Amended Complaint ("Third Amended Complaint") **[DE 160]** seeking damages, declaratory and injunctive relief against Waste Management, the City of Coral Springs and the District.  In Count I, Plaintiffs allege that the Defendants have violated 42 U.S.C. § 1983 by violating the Plaintiffs' rights to engage in interstate commerce under the Dormant Commerce Clause of the United States Constitution, U.S. Art. I, § 8, cl. 3 (the "Dormant Commerce Clause").  In Count II, the

---

[1] Although Plaintiffs state that their motion is for "partial summary judgment," they are seeking judgment on all issues of liability. Their briefing, however, fails to address most of the affirmative defenses of the Defendants. Because I grant summary judgment on liability for the Defendants, I do not address the Defendants' further argument that the Plaintiffs' motion for partial summary judgment should be denied on that ground, although I conclude their position has merit.

[2] I deny Coral Springs' motion to strike or exclude because it is mooted by my ruling on summary judgment in favor of the Defendants.

[3] The Defendants have filed cross-motions to adopt the other Defendants' Motions for Summary Judgement **[DE 287and 291]**.

[4] During oral argument, I spent considerable time narrowing the undisputed facts. Where germane, I refer to the parties' stipulations during oral argument in the body of this Order.

Plaintiffs allege that Defendants have violated Plaintiffs' rights to engage in foreign commerce under the Dormant Commerce Clause.[5] In Count III, Plaintiffs seek a declaratory judgment as to "those operations that Southern Waste and Sun may carry on within Broward County." (Third Am. Compl. ¶ 53).

Prior to the filing of the Third Amended Complaint, I had granted the Defendants' motion to dismiss Count III of the Second Amended Complaint. **[DE 121]**.  That Count was pled as an alternative declaratory judgment claim to the effect that the "materials" the Plaintiffs handle are not governed by Chapter 403, Florida Statutes.  Although I did not address Count III with prejudice, it was not further amended in the Third Amended Complaint.

The Defendants have filed answers and numerous affirmative defenses to the Third Amended Complaint. **[DE 206, 207, 210]**.  Coral Springs also has filed a counterclaim **[DE 73]**. Specifically, the City seeks damages for tortuous interference against Southern Waste, an accounting and injunctive relief.  Counter-Defendant Southern Waste has filed an answer to the counterclaim **[DE 78]**.  Because the counterclaim turns on the validity of the Franchise Agreement and City Ordinance under the Dormant Commerce Clause, I conclude, pursuant to Fed.R.Civ.P. 54(b), that the resolution of the counterclaim should

---

[5] Although the Commerce Clause is an affirmative grant of power to Congress, U.S. Const. Art I, § 8, cl. 3, the Supreme Court has interpreted the clause to contain a negative aspect, the so-called "Dormant Commerce Clause."  The Dormant Commerce Clause " 'prohibits economic protectionism — that is, regulatory measures designed to benefit in-state economic interests by burdening out-of-state competitors.' " *Wyoming v. Oklahoma*, 502 U.S. 437, 112 S.Ct. 789, 800, 117 L.Ed.2d 1 (1992).

await a final determination of the Dormant Commerce Clause issue in the event of any appeal. Because there is no just reason for any delay of the final resolution of the Dormant Commerce Clause issue on appeal, and because I conclude there are material facts in dispute as to liability and damages on the counterclaim,[6] I shall direct entry of a final judgment on Defendants' motions for summary judgment, but not on the City's counterclaim which I shall stay pending the results of any appeal to the Eleventh Circuit Court of Appeals. I also shall direct entry of a final judgment on the dismissal of Count III of the Second Amended Complaint.

### III. <u>FACTUAL BACKGROUND AND SUMMARY JUDGMENT STANDARD</u>

The parties have filed a voluminous record purporting to comply with Local Rule requirements on summary judgment and by submitting supporting affidavits and a multitude of depositions and the like **[DE 277-280, 282, 284-286, 290-291, 294, 305, 306, 309-312, 314, 316-318, 323, 335-336, 343, 348, 350, 358-359]**. Because it would not be helpful to the resolution of this cause, and because it would unduly lengthen this Order without any meaningful benefit, I decline to set forth a detailed factual recitation which discusses every fact presented, particularly where many of those facts are not material. Instead, I set forth below material facts which I conclude are not in dispute as supported by the record (with all inferences in favor of the non-moving party), and which are relevant to determine the specific issues raised by the respective parties' summary judgment motions. I do so based

---

[6]

There are material issues of fact affecting liability which require resolution at trial, including whether the claimed intentional interference was with a business's relationship to the community at large. *Ethan Allen, Inc. v. Georgetown Manor, Inc,* 647 So.2d 812, 815 (Fla. 1994). At oral argument, the Plaintiffs conceded that final summary judgment on liability in their favor would not be appropriate at this juncture.

on my own review of this voluminous factual record, including the pleadings, the discovery and disclosure materials on file, and the affidavits.

My review has been made more difficult because the Plaintiffs have not complied with Southern District of Florida Local Rule 7.5(B) by providing a single concise statement of material facts as to which they contend that there exists a genuine issue to be tried. They have provided three Statements of Facts. In addition, Plaintiffs have provided an "Issue Statement" which they have mislabeled as containing facts without proper citations to the record.  Notwithstanding, I decline to grant Waste Management's motion to strike **[DE 337]**.

I have  applied the traditional standard for review under Fed.R.Civ.P. 56 and Eleventh Circuit case law to the undisputed material facts as determined below. This standard has been well-summarized in the parties' briefs. [See **DE 276 p. 3- 4**]; **[DE 281, pp. 5-6; DE 292, p. 4-5]**.  Accordingly, I incorporate the standard by reference here.[7]

### IV. <u>Summary of the Court's Ruling on Summary Judgment</u>

I conclude the Defendants are entitled to summary judgment as a matter of law, and that the Plaintiffs' motion for partial summary judgment should be denied. The crux of this

---

[7]

I grant Southern Waste's motion to strike the affidavit of Charles Lomangino **[DE 338]** and the affidavit of Anthony Lomangino **[DE 339]** which were filed in support of Plaintiffs' motion for partial summary judgment. Mr. Charles Lomangino was not disclosed as a witness, and the Defendants did not have an opportunity to depose him. I also concur with Southern Waste that the Charles Lomangino's affidavit contains conclusionary allegations and opinions which were not shown to be based on his  personal knowledge, and, in any event, the affidavit lacks probative value because the majority of statements are  not based on specific facts. Even if I considered the affidavit,  it would not change my conclusions in this Order. Likewise, the majority of statements in Anthony Lomangino's affidavit are not based on specific facts. Rather, the affidavit contains conclusionary allegations, opinions, and hearsay. This affidavit is stricken as well. Even if I considered the affidavit, it would not change my conclusions.

case is that Southern Waste wants the right to compete with Waste Management, the exclusive franchise holder for the collection of commercial waste and debris ("C&D") in the City of Coral Springs. It then wants to haul the collected commercial waste to its sister company, Sun, which has in-District waste processing and recycling facilities in Broward County.[8] By doing so, Southern Waste and Sun thereby seek to increase their market share for commercial C&D collection and processing.[9]

In effect, the Plaintiffs want this Court, by judicial edict, to make Coral Springs an "open city," like Hollywood, Fort Lauderdale and Oakland Park (members of the District) for purposes of commercial solid waste collection.[10]  The only restriction Plaintiffs can identify

---

[8]

Plaintiffs are two related companies. Southern Waste is the hauling/collection arm. It utilizes trucks to collect solid waste materials from construction and demolitions sites in South Florida. Sun represents the disposal/processing arm. It owns and operates facilities at two disposal sites within the District (Dania and Pompano Beach) that accept construction and demolition debris for processing, whereby some components are recycled and others are disposed of, primarily by landfill. In their Third Amended Complaint, the Plaintiffs allege that they deal in "materials." However, it is undisputed that this case is about commercial C&D and not some unspecified type of materials.

[9]

Plaintiffs have testified that their claims in this case are about commercial construction and demolition debris generated in Coral Springs only, and not curbside waste collection. (Gusmano Depo. Tr. 245: 16-246:13). At oral argument, I inquired, "...[s]o you are here because you want to increase your market share legally in Coral Springs." Mr. Elsberry, on behalf of the Plaintiffs replied, "That is correct." I also inquired: "So you want to make it (Coral Springs) an open city, in effect, like some of the other cities in Broward ....?" Mr. Elsberry replied, "That is correct."

[10]

Different cities within the District treat the collection of construction and demolition debris differently. Some cities have exclusive franchises with haulers for the collection of all waste, including all construction and demolition debris. Some cities do not have exclusive franchises with haulers of any type of waste.

as it pertains to their business in Coral Springs is the City's refusal to allow Southern Waste to place collection containers at commercial C&D sites. This is strictly an issue associated with the exclusive Franchise Agreement between Coral Springs and Waste Management. While the Plaintiffs' primary aim is to invalidate the exclusive Franchise Agreement, and the companion city ordinance, they have attempted, in their Third Amended Complaint, to blur their constitutional claims by referencing so-called "flow control" regulations put in place by the District. The Plaintiffs then call the District's regulations, the City Ordinance and the Franchise Agreement "the Regime" without meaningfully distinguishing among the components of "the Regime." The Plaintiffs use this tactical approach to avoid clear Eleventh Circuit case law to which Southern Waste was a party.

At the same time, Plaintiffs are not against exclusive franchises within Broward cities. They are apparently happy with them when they are able to win them, as Southern Waste has done in Oakland Park within the District. In those instances, it has hardly confessed such arrangements constitute violations of the commerce clause. At no time during the pendency of this litigation has it withdrawn from exclusivity arrangements in Oakland Park.[11]

---

[11] In *East Coast Recycling, Inc. v. The City of Port St. Lucie,* 234 F.Supp.2d 1259, 1266 (S.D.Fla. 2002), an operator of recycling facilities brought a Section 1983 action against the city and the county, alleging that, through interlocal agreement between defendants, and various city and county enabling ordinances, the defendants created a monopoly impermissibly directing the flow of solid waste to county-owned facilities, in violation of the Commerce Clause. In denying relief, the District Court noted, "The Court is quite confident that if East Coast were the favored facility, it would vigorously defend the arrangement and argue that there is no commerce clause violation." In the same manner here, this Court is quite confident that if Southern Waste were the exclusive franchise holder in Coral Springs, and Waste Management was the complaining party, Southern Waste would vigorously claim that there is no Commerce Clause violation. The long, contentious history in these solid waste cases simply makes the point. It simply depends case-to-case as to who is financially disadvantaged.

But neither Southern Waste nor Sun had competed for the exclusive franchise in Coral Springs. They are unhappy that Waste Management did, and that it  enjoys the benefits of the exclusive franchise to the Plaintiffs'  financial detriment through the remaining term of the Franchise Agreement.

Essentially, all three counts of the Third Amended Complaint return to the basic issue of Waste Management's sole right to collect commercial construction and demolition debris as part of its Franchise Agreement with Coral Springs. All of the evidence on summary judgment demonstrates that Plaintiffs' only real complaint is that Southern Waste is prevented by City Ordinance § 8-3 and the Franchise Agreement from collecting construction and demolition debris at commercial sites within the city.

While the Plaintiffs implicate the District in the Third Amended Complaint, nothing from the District prevents Southern Waste from collecting C&D in Coral Springs. Instead, C&D collected in the District may be transported by haulers to Sun's facilities without any interference from the District under any of its plans of operation or interlocal compacts.[12] All of Plaintiffs' witnesses, their "experts," and the Defendants' witnesses have testified that construction and demolition debris collected at commercial sites in Coral Springs can be delivered to Sun's facilities under the District's rules and policies. The only obstruction preventing this from happening is the Franchise Agreement and City ordinance.  As such, the bottom line is that no Defendant has precluded Plaintiffs from taking materials they

---

[12]

As conceded at oral argument, Sun has been operating its facilities since 2001 without any interference from the District. It was further conceded that commercial C&D, as well as residential C&D, are hauled by Southern Waste's two facilities without interference from the District, notwithstanding that the hauling of commercial C&D is in violation of the City's ordinance and the Franchise Agreement.

collect to Sun's facilities or anywhere else they desire within the District or out-of-state once the materials have been collected by Southern Waste and placed in their trucks. However, Sun does not want the materials hauled out-of-state because it does not own processing facilities other than in Florida, and it has no contractual relations with any out-of-state facilities.  For that matter, nothing in the City's ordinance or in the Franchise Agreement prevents Waste Management from taking C&D from Coral Springs to Sun's facilities if it chooses to do so. Waste Management  has elected not to do so for its own financial reasons since it hauls commercial C&D to its own processing facilities within the District.

In sum, there are no direct and material  interstate commerce nexus concerns in this case. Southern Waste does not transport materials to any facility outside the State of Florida, nor does it, or Sun, operate any facilities outside the State of Florida. Neither has been denied the right by any Defendant from transporting commercial waste outside of the State of Florida. In point of fact, if an injunction was issued by this Court, Southern Waste concedes it would simply transfer the waste to Sun's facilities in Pompano and Dania, Broward County, Florida, for processing.[13]  Finally, Plaintiffs do not sell any of their products directly to customers located outside the State of Florida.  At best, Sun contends that it sells materials to Florida customers, who, in turn, may ship the materials outside the State of Florida.  (Gusmano Depo.Tr. 124:11-23). For reasons further discussed below, there are no Dormant Commerce Clause infringements pertaining to interstate or foreign commerce.

---

[13]

Plaintiff Southern Waste alleges that "Sun Recycling is prevent from receiving the raw materials that it processes and resells ..." (Third Am. Compl.  ¶ 36). But the Plaintiffs do not contend that it is the District that prevents Plaintiffs' from collecting C&D in Coral Springs or processing C&D collected in Coral Springs at Sun's facilities.  (*See* Gusmano Plaintiffs' Corp. Rep. Depo. Tr. 141:19-142:4; 144:5-9).

## V. ANALYSIS

### A.   Prior Litigation Decided by the Eleventh Circuit Against Southern Waste.

This is not the first time the issues raised in Plaintiffs' Third Amended Complaint have been litigated and resolved against it.[14] The essential and basic issue raised by the Third Amended Complaint concerns Coral Springs and Waste Management's right to enter into an Exclusive Franchise Agreement for the collection of commercial solid waste within Coral Springs. This same issue has been decided by the Eleventh Circuit Court of Appeals in a previous unsuccessful lawsuit brought by Southern Waste, the same plaintiff as in this case, against the City of Delray Beach, Florida.

When faced with the fact that Coral Spring's Ordinance § 8-3 and franchise is virtually identical to the ordinance and franchise that were upheld by the Eleventh Circuit, Plaintiffs have patched together a legal theory involving a "Flow Control Regime" of regulations that patently lacks merit and, frankly, contain misrepresentations unsupported by the factual record; namely, Plaintiffs allege that (1) Coral Springs has a flow control ordinance directing where waste must be processed and disposed of, and (2) that the District prevents Southern Waste from collecting such waste, and further prevents Sun from

---

[14]

The Second Circuit noted almost a decade ago, "[a]lthough the flood of milk cases has receded in recent years, it has given way to a federal docket that is just as clogged with-of all things-garbage." *SCC Corp. v. Town of Smithtown,* 66 F.3d 502, 504 (2d Cir. 1995), *cert. denied*, 516 U.S. 1112 (1966). The following is a sample of the litigation involving the Plaintiffs where they have challenged local governments' waste management methods: *Southern Waste, LLC v. City of Sunrise*, Case No. 09-61302-CIV (S.D.Fla.); *Southern Waste Systems, LLC v. City of Delray Beach, Fla.,* 420 F.3d 1288 (11th Cir. 2005); *Southern Waste Systems, LLC v. Town of Lake Park, Fla & Waste Mgmt. of Florida, Inc.,* Case No. 05-80174-CIV (S.D.Fla.); *Southern Waste Systems, LLC v. Town of Davie, Fla. & Waste Mgmt. Inc. of Florida,* Case No. 05-608347-CIV (S.D.Fla.)

receiving construction and demolition debris to process.

In *Southern Waste Systems v. City of Delray Beach*, 420 F.3d 1288 (11th Cir. 2005), the Eleventh Circuit rejected Southern Waste's challenge to Waste Management's exclusive franchise agreement with the City of Delray Beach under the Dormant Commerce Clause. A comparison of both cases establishes that the material facts are essentially the same. In the *City of Delray Beach* case, the City issued a request for proposals seeking a single contractor to provide comprehensive waste collection services within the City. Under that request for proposal ("RFP"), the successful bidder would become the exclusive provider of residential waste collection services, residential waste recycling services, and commercial waste collections services throughout the City. The agreement was to have an initial term of five years.

Here, exclusivity is limited **only** to commercial solid waste collection services. Like the *Delray Beach* case, Coral Springs' ordinance is not a "flow control ordinance."[15] It does not direct the flow of waste to any specific facility. Rather, it is a mandatory service ordinance compelling residents to use a particular franchise contractor for commercial C&D. As such, this case is directly in line with the situation in the *Delray Beach* case, with one compelling difference; namely, Southern Waste Systems, which is in the business of collecting and disposing of construction and demolition debris, can readily compete within the City of Coral Springs for the collection of **residential** solid waste collection services. In

---

[15] As stated in *United Haulers Association, Inc. v. Oneida-Herkimer Solid Waste Management Authority,* 550 U.S. 330, 127 S.Ct. 1786, 1790 (2007), "'flow control' ordinances require trash haulers to deliver solid waste to a particular waste processing facility." Here, the City Ordinance does not require Waste Management, or anyone else, to deliver waste to a particular private processing facility, let alone one operated by the District.

order to do so, Southern Waste had to be a "licensed hauler"in accordance with City Ordinance 95-135.  With such a license, Southern Waste would be authorized to collect and dispose of construction and demolition debris for single family and multi-family residential sites.

In the *City of Delray* case, Southern Waste lacked the capacity to provide the full range of services specified in the proposal and did not submit a bid to the City of Delray Beach. The same is true here.  Neither Southern Waste, nor its sister company, Sun Recycling, LLC,  submitted a bid to the City of Coral Springs, nor did either attend the pre-proposal conference, or otherwise express any interest in providing services to the City of Coral Springs in response to the RFP.  Moreover, in the *City of Delray* case, five companies, including BFI Waste Systems of North America, Inc. — a non-Florida company — did submit bids. Following a public hearing, the City awarded the contract to BFI, the lowest bidder.[16] As such, in that case, Southern Waste conceded that local firms enjoyed no preference or advantage in the bidding and selection process. The same is true here. Southern Waste does not contend that Waste Management was awarded the bid other than through a non-discriminatory, open and fair bidding process.

In the present case, the City of Coral Springs, on May 20, 1998, issued a Request for Proposals for Solid Waste Collection and Disposal and Recycling Services. A pre-proposal conference was held on June 8, 1998. Eleven firms attended the pre-proposal and

---

[16]

In *City of Delray*, the City and BFI entered into a contract that provided that BFI would be the exclusive waste hauler in the City. The contract further provided that, while the City would set the rates for waste collection, BFI would directly bill and collect payment from the City's residents, and then transmit a 5% franchise fee to the City. The City codified the contract by municipal ordinance.

four firms were short-listed by the City's Selection Committee. The four firms included  BFI — the same non-Florida company involved in the *City of Delray* case, as well as Waste Management, Kimmins Recycling and All Service Refuse. All Service Refuse was incorporated in Florida in 1979 but later was merged into Republic Services of Florida, a Delaware limited partnership.  BFI was a Delaware corporation.  The Selection Committee recommended that the RFP be awarded to Waste Management as the highest ranked proposer under the criteria set forth in the Request for Proposals.  Thereafter on February 16, 1999, the City Commission accepted the recommendation of the Selection Committee and approved a contract with Waste Management. The evidence of record conclusively establishes that the bid process was fair, non-discriminatory and open to all and did not favor one company over another because of its locale. The bid process also included out-of-state participants.

The Franchise Agreement, among other rights, grants to Waste Management "the exclusive franchise and concomitant obligation to provide solid waste collection services within the municipal borders, except for residential construction and demolition debris... and except for commercial recycling pursuant to § 403.7046, Florida Statutes." **[DE 280-6, p. 3]**. According to § 2.02 of the Agreement, Waste Management is to delivery the solid waste collected [both residential and commercial]  "... to the resource recovery system transfer or disposal facility or facilities designated in the plan of operation under the Interlocal Agreement with Broward County for Solid Waste Disposal Service, dated November 25, 1986, unless otherwise provided for by agreement with the Broward Solid Waste Disposal District to accommodate a City waste material recycling program." *Id*.  Pursuant to § 8-3 of

13

the City Code, every owner or tenant is required to utilize Waste Management as the City's exclusive provider, to collect and dispose of all solid waste, refuse, trash and debris generated at commercial construction or demolition sites and requires every owner, tenant or resident to utilize a licensed hauler for residential construction and demolition sites.

Unlike in he *City of Delray Beach* case, in this case, Southern Waste does not claim in its Third Amended Complaint that any customer to whom Southern Waste has supplied C&D commercial service in violation of the City's Ordinance has been cited, nor has Southern Waste claimed that it has been fined for violating § 8-35(8)(a) which imposes a maximum $500 fine for violation of the Code.[17]   Nonetheless, the City of Coral Springs has provided ample evidence that Southern Waste has been systematically violating the City Code by collecting commercial construction and demolition debris since at least 2002. It continues to do so even after receiving Notices of Violations and has even offered to pay fines assessed against its customers.

In the *City of Delray Beach* case, the *district court* granted partial summary judgment to Southern Waste on its claim for injunctive and declaratory relief, holding that the exclusive franchise agreement violated the Commerce Clause, and enjoined enforcement of the portions of the agreement and ordinance pertaining to C&D. Upon review, the Eleventh Circuit reversed holding that the contract in question did not violate the Commerce

---

[17]

In the *City of Delray Beach* case, a customer to whom Southern Waste supplied C&D services was cited for violating the ordinance. Southern Waste filed the action to challenge the ordinance and the underlying agreement between the City and BFI. Southern Waste asked the court to declare that the exclusive franchise violated the Commerce Clause of the United States Constitution and to enjoin its enforcement as to C&D. After Waste Management purchased various assets of BFI and assumed BFI's rights and obligations under the contract and ordinance, it was substituted as a party.

14

Clause because it did not favor in-state haulers. In rendering its decision, the Eleventh

Circuit determined that the City's ordinance did not violate the "dormant" side of the

Commerce clause[18] "... because it award the exclusive right to collect waste in the City to

one company, thereby excluding all other companies-both interstate and intrastate-from

waste collection." *City of Delray Beach*, 420 F.3d at 1290.

In a manner which resolves the first prong analysis in this case as it relates to the

Franchise Agreement and the City's Ordinance, the Eleventh Circuit stated:

> In this case, SWS claims that the City's ordinance violates the dormant
> Commerce Clause because it awards the exclusive right to collect waste in
> the City to one company, thereby excluding all other companies — both
> interstate and intrastate — from waste collection. SWS relies for this claim on
> the Supreme Court's decision in *C & A Carbone, Inc. v. Town of Clarkstown*,
> 511 U.S. 383, 114 S.Ct. 1677, 128 L.Ed.2d 399 (1994). In that case, the
> Court struck down a municipal ordinance that awarded exclusive rights to
> process all town solid waste to a single, privately owned local transfer station.
> 511 U.S. at 391, 114 S.Ct. 1677. The ordinance mandated that all waste
> haulers in the town transport their waste to the local station for processing.
> The Court held that such an arrangement constituted a "forced business
> transaction" that unconstitutionally favored the local processor, thereby
> discriminating against out-of-state interests. *Id.* at 391-92, 114 S.Ct. 1677.
>
> Following *Carbone*, waste haulers around the country challenged municipal
> waste collection agreements that awarded exclusive rights to collect waste to

---

[18]

The Commerce Clause provides that "Congress shall have Power ... to regulate Commerce
with foreign Nations, and among the several States, and with the Indian Tribes." U.S.
Const., Art I, § 8, cl. 3. The Court has long interpreted the very existence of Congress'
powers under the Commerce Clause to implicitly preclude the States from imposing
excessive restrictions on that same power. See *Dennis v. Higgins*, 498 U.S. 439, 447, 111
S.Ct. 865, 112 L.Ed.2d 969 (1991). This implicit Constitutional restriction upon the States
has become known as the "dormant" or "negative" Commerce Clause doctrine. Further, the
strictures of the dormant Commerce Clause are not limited to States, but also apply to
counties within each State. *Ft. Gratiot Sanitary Landfill, Inc. v. Michigan Dept. of Natural
Resources*, 504 U.S. 353, 112 S.Ct. 2019, 119 L.Ed.2d 139 (1992).

one hauler, arguing that their exclusivity constitutes a forced business transaction that offends the Commerce Clause. None was successful. *See Houlton Citizens' Coalition v. Town of Houlton*, 175 F.3d 178 (1st Cir.1999); *USA Recycling, Inc. v. Town of Babylon*, 66 F.3d 1272 (2d Cir.1995); *Barker Sanitation v. City of Nebraska City*, No. 4:02CV3330, slip op. at 14-22 (D. Neb. Nov. 4, 2003); *Waste Management of Alameda County, Inc. v. Biagini Waste Reduction Sys. Inc.*, 63 Cal. App. 4th 1488, 74 Cal. Rptr .2d 676 (Cal. App. 1 Dist.1998). *See also Harvey & Harvey, Inc. v. County of Chester*, 68 F.3d 788, 807 (3d Cir.1995) (dormant Commerce Clause inquiry should focus "on the designation process, on the reasonableness of the duration of the designation and on the practical likelihood of [designation of] an out-of-state facility"). These courts all agreed that there is nothing inherently discriminatory in the award of an exclusive waste hauling contract. As the Second Circuit noted in USA Recycling:

> For ninety years, it has been settled law that garbage collection and disposal is a core function of local government in the United States. At their option, cities may provide garbage pick-up to their citizens directly ... Or they may rely on a closely regulated private market to provide those services.... [W]e reject the plaintiffs' contention that the *Carbone* decision fashioned from the "dormant" Commerce clause a new, and unprecedentedly sweeping, limitation on local government authority to provide basic sanitation services to local residents and businesses, on an exclusive basis and financed by tax dollars. *Id.* at 1275-76.

The Commerce Clause forbids only the promotion of local economic interests over out-of-state interests. **It does not forbid exclusive franchise agreements whereby a city selects one waste hauler to provide basic waste collection services to its citizens, so long as the bidding process is open to all, and there is no requirement that local interests be favored in the performance of the contract.** As the Second Circuit concluded in USA Recycling:

> There is no reason to assume that by shifting all hiring of garbage haulers into the hands of one buyer, the flow of interstate commerce will be reduced, and thereby burdened. In fact, the open bidding process used by the Town to hire a single garbage hauler could readily result in the hiring of an out-of-state garbage hauler-which would actually shift a portion of the garbage collection market into interstate commerce. *Id.*

16

> Indeed, in the instant case, the waste collection franchise was not only open to out-of-state competitors, but it was, in fact, awarded to one. There is nothing in the record to support the claim that the City's actions constituted the sort of "local economic protectionism" that the Commerce Clause forbids. *Carbone*, 511 U.S. at 390, 114 S.Ct. 1677.  We agree with the First Circuit that "to the extent that in-state and out-of-state bidders are allowed to compete freely on a level playing filed, there is no cause for constitutional concern." *Houlton*, 175 F.3d at 189. The award of an exclusive waste hauling contract to the low bidder after a fair and open bidding process that has the effect of excluding all others for the term of the agreement does not, for this reason, offend the Commerce Clause.

*City of Delray Beach*, 420 F.3d at1290 (Emphasis added).

As explained in *City of Delray Beach*, a two tier analysis is implemented to determine whether a statutory scheme violates the dormant Commerce Clause. *City of Philadelphia v. New Jersey*, 437 U.S. 617, 624, 98 S.Ct. 2531, 57 L.Ed.2d 475 (1978);  *Delray Beach*, 420 F.3d at 1290.  Under the first tier, if the statute is found to discriminate against interstate commerce on its face, or has the effect of discriminating against out-of-state interests to the benefit of in-state economic interests, the statute will generally be struck down as a *per se* constitutional violation. *Id*. But, even if the statute discriminates against interstate commerce, it will be upheld if it advances a legitimate local interest that cannot be fulfilled by other reasonable nondiscriminatory alternatives. *C & A Carbone, Inc. v. Clarkstown*, 511 U.S. 383, 392, 114 S.Ct. 1677, 128 L.Ed.2d 399 (1994). "At a minimum such facial discrimination invokes the strictest scrutiny of any purported legitimate local purpose and of the absence of nondiscriminatory alternatives." *Hughes v. Oklahoma*, 441 U.S. 322, 99 S.Ct. 1727, 1737, 60 L.Ed.2d 250 (1979).

If the statute passes the *per se* analysis, it may nevertheless be found unconstitutional under the second tier of analysis. With the second category — the

"evenhanded statutes" that effectuate a legitimate local interest and that only incidentally affect interstate commerce — the Court must apply the "*Pike* balancing test." The statute will be upheld unless the burden it imposes on interstate commerce is " 'clearly excessive in relation to the putative local benefits.' " *Pike v. Bruce Church, Inc.*, 397 U.S. 137, 142, 90 S.Ct. 844, 25 L.Ed.2d 174 (1970).  In *City of Delray Beach,* the Eleventh Circuit did not consider the second tier analysis because the district court did not reach this second step in its review of the ordinance. *City of Delray Beach*, 420 F.3d at 1290 n. 3.

Here, based upon my review of the entire record, and applying applicable summary judgment standards, I conclude that the Franchise Agreement and City Ordinance do not constitute *per se* constitutional violations by discriminating on their face, individually and collectively, by awarding exclusive rights to collect and dispose of  commercial waste to Waste Management; that is, Ordinance § 8-3 does not facially discriminate or even implicate interstate commerce as it merely requires the use of Waste Management for commercial waste collection in Coral Springs.  As the Eleventh Circuit concluded in *City of Delray Beach,*  there is nothing in the bid process here which promoted local economic interests over out-of-state interests. The bidding process was open to all, and there was no requirement that local interests be favored in the performance of the contract.  I find nothing in the record to support the claim that the City's actions constituted the sort of "local economic protection" that the Commerce Clause forbids.[19]   Merely because the City

---

[19]

Prior to the Eleventh Circuit's opinion in *City of Delray Beach*, Southern Waste had filed a similar challenge to the Town of Davie and Waste Management's franchise agreement and sought preliminary injunction. *Southern Waste Systems, Inc. v. Town of Davie, Florida and Waste Management Inc. of Florida*, Case No. 05-60847-DIV-DIMITROULEAS. In that case Southern Waste claimed that the Town's exclusive solid waste franchise agreement

Ordinance and Franchise Agreement required compliance with the District's Interlocal Agreement and Plan of Operations for disposal does not itself violate the Commerce Clause. *East Coast Recycling, Inc. v. City of Port St. Lucie*, 234 F.Supp.2d 1259, 1264 (S.D.Fla. 2002) (holding that "mere reference to the Interlocal Agreement in the city's ordinances, even assuming the Interlocal Agreement impermissibly burdens interstate commerce by restricting the flow of solid waste, is not enough to render those ordinances invalid.").[20]

### B. The District's Flow Control Regulations

The Plaintiffs do not raise in their Third Amended Complaint, or argue on summary judgment,  any second prong *Pike* issues  **solely** related to the Franchise Agreement and Ordinance.[21] Instead, they do so  as to the "Flow Regime." Accordingly, I do not apply a *Pike*

---

with Waste Management violated the Dormant Commerce Clause because commercial builders and contractors were not free to transact business with any contractor, other than Waste management, for the removal of C&D materials. Southern Waste claimed that the Town of Davie does not pay for the service provided by Waste Management –only builders and contractors pay Waste Management and that the Town received a "financial donation" from Waste Management whereby a portion of the revenue generated by Waste Management is given back to the Town. Denying preliminary injunction, Judge Dimitrouleas found no *per se* violation. Additionally, balancing the effects of the Franchise Agreement upon interstate commerce against the putative local benefits, the Court found that any burden on interstate commerce can only fairly be described as *de minimis*. The case was ultimately voluntarily dismissed by Southern Waste.

[20]

Even assuming I concluded that the alleged "scheme" in the Interlocal Agreement and Plan of Operations was unconstitutional, Southern Waste would still be prohibited by the Franchise Agreement and Ordinance from collecting C&D from commercial  sites within Coral Springs, which, in turn, would preclude it from taking from taking the materials from Coral Springs to Sun.

[21]

At oral argument, the Plaintiffs concede that they did not claim a *Pike* violation based only on the City Ordinance and Franchise Agreement.

analysis to the Franchise Agreement and Ordinance alone, but, if I did, I would reach the same result as that set forth below regarding the District's regulations.

Attempting to avoid the clear precedent of *City of Delray Beach*, the Plaintiffs have blurred the analysis by combining their claims regarding the Franchise Agreement and City Ordinance with a purported "flow control" regulation put in place by the Broward Solid Waste Disposal District. The linkage, claim Plaintiffs, is that the Franchise Agreement provides that Waste Management must deliver the solid waste collected in Coral Springs to a resource recovery system transfer or disposal facility or facilities designated in the Plan of Operation under the Interlocal Agreement with Broward County for Solid Waste Disposal Services ("BSWDD"). The Plaintiffs claim that "[s]uch combination of contracts, ordinances and interlocal agreements constitute *de facto* regulation by Coral Springs and the BSWDD of the processing and disposal of the Southern Waste and Sun Recycling dealt with materials that discriminates against interstate and foreign commerce by requiring all processing and disposal of such waste to occur within Broward County, Florida ...." (Third Am. Compl., ¶ 31).

To begin with, neither Southern Waste nor Sun can point to any action taken by the District which prevents either of them from hauling and processing C&D once it is collected within Coral Springs. No rule or regulation of the District prohibits Southern Waste from taking materials to Sun's disposal facility in Broward County (even commercial materials in violation of the Franchise Agreement). To the contrary, the District's Plan of Operation specifically envisions and allows such transport and delivery.[22] In fact, Sun's facilities in

---

[22]

I discuss this point in more detail later in this Order.

Pompano and Dania have always been listed as approved alternative facilities for Unprocessable Waste and Construction and Demolition Debris under Broward County's Plan of Operation, and, unlike Sun's competitors in other counties in Florida that are not listed as approved facilities, Sun is a favored local facility under the Plan of Operation. No rule or regulation of the District prevents or prohibits collection by Southern Waste in Coral Springs.

The situation here is that Plaintiffs are local companies, who conduct an entirely local business. Southern Waste concedes it does not transport materials to any facility outside of the State of Florida (and has no desire to do so). Nor do the Plaintiffs own or operate any facilities outside the State of Florida. Sun has further admitted that none of its customers (to whom it sells the various components that Southern Waste collects) are located outside of the State of Florida. Neither Southern Waste or Sun have requested permission from the District to transport waste outside of the State of Florida. The interstate nexus is non-existent and contrived.[23]

Given this situation, Southern Waste, now joined by Sun, once again seeks to reassert prior unsuccessful Dormant Commerce Clause claims by implicating "the flow control regime." **[DE 292, p. 1]**. They claim that the City, working in concert with the Broward Solid Waste Disposal District and Waste Management, discriminates against

---

[23]: What is truly bizarre about this case is Sun's argument that its own facilities are currently operating in violation of the Interlocal Agreement and the Plan of Operations while the District unequivocally says that Sun's facilities are in full compliance, and none of the facilities has ever received a notification of non-compliance. At oral argument, I inquired if Sun was prepared to cease its operations immediately within the District. Mr. Elsberry, on behalf of Sun, replied, "No, sir, I didn't mean to suggest that."

interstate commerce by (1) requiring all material generated at commercial construction and demolitions sites within the City be delivered to and processed at certain privately-owned local facilities, and (2) impeding the flow of the materials, and the byproducts created from processing such materials, from entering interstate and foreign commerce. They contend that the "flow control regime" comprises four elements: (1) the Interlocal Agreement with Broward County for Solid Waste Disposal Service (the "ILA"); (2) the Plan of Operations ("the Plan"); the City's ordinances, specifically Ordinance § 8-3 ("the Ordinance"), and the Franchise Agreement between the City and Waste Management.[24]

Virtually ignoring the Eleventh Circuit's *City of Delray Beach* decision, the Plaintiffs claim that the Defendants have attempted to circumvent what is constitutionally permissible with respect to controlling the flow of materials generated in Broward municipalities, as previously determined in *Coastal Carting Ltd. Inc. v. Broward County, Florida,* 75 F. Supp. 2d 1350 (S.D. Fla 1999). Of course, much has happened since Judge Gonzalez issued his *Coastal Carting* decision. Since that time, the Interlocal Agreement and the Plan of Operations now allow, and have done so during the pendency of this litigation, the disposal of solid waste and construction and demolition debris outside of the State of Florida and at alternative locations in the District, but not at other facilities in the State of Florida outside of the District. Also, the United States Supreme Court has rendered additional decisions

---

[24]

The Plaintiffs claim without evidentiary foundation sufficient for summary judgment that the City's actions are precluding materials generated in the City from being processed out-of-state because the city is using its leverage in the collection and disposal markets to exert a regulatory effect in the processing market by requiring Waste Management to dispose of the material at the processing facilities designated in the Plan, which are only located in Broward County. However, neither the Interlocal Agreement nor the accompanying Plan of Operations prevents the delivery of solid waste and C&D outside of the State of Florida.

which further clarify the applicable law on the Dormant Commerce Clause. I will discuss that in due course. But, since Plaintiffs rely on *Costal Carting* case, it is first important to put the circumstances of that case in context.

In *Coastal Carting*, a solid waste hauler brought an action against Broward County; twenty-three municipalities in Broward County, and the Resource Recovery Board of Broward Solid Waste Disposal District alleging that Broward County Ordinances §§ 87-3 and 87-4 were unconstitutional and unenforceable.  Citing to the Supreme Court's decision in *Carbone*, the Court found that the restrictions imposed by Ordinances §§ 87-3 and 87-4 on waste collection and disposal in Broward County violated the Commerce Clause of the United States Constitution. Judge Gonzalez found that the "... real problem in Broward County, which is analogous to the problem in *Carbone*, is that, with respect to the local waste, the ordinance favors two Broward County transfer stations thereby forcing waste haulers to keep the waste in the County while depriving interstate or intercounty interests of access to the local processing market." 75 F.Supp.2d at 1350. In essence, Judge Gonzalez found that the real problem is the fact that Coastal, the hauler, was prevented from taking the waste outside of Broward County. *Id*.

The complex Broward scheme, which was the subject of the *Coastal Carting* case, shares a common factual background with this case, with some important additions.[25] In *BFI Waste Systems of North America, Inc. v. Broward County, Florida,* 209 F.R.D. 509 (S.D. Fla. 2002), Judge Gonzalez again addressed the interrelationships among the various

---

[25]

The parties' factual statements are consistent with Judge Gonzalez's order. I see no reason to restate what has been already set forth by Judge Gonzalez, except to note important additions which have occurred since his order.

entities in a matter which is pertinent here:

> The relationships between and among the various agreements, ordinances, parties, and persons absent from this case, raised by the County's Motion to Dismiss, are complex. But, because the precise nature of these relationships is an essential element of the foundation upon which the Court's Order is based, the Court will attempt to elucidate them as succinctly as practicable.

> With its landfills burgeoning in the late 1980s, the County, like many political subdivisions in states nationwide at that time, took steps to address the problems associated with the disposal of solid waste. The County, along with twenty-three (23) of the County's incorporated municipalities (the "Cities"), entered into "An Interlocal Agreement with Broward County for Solid Waste Disposal" (the "Interlocal Agreement"). *See* Compl. ¶ 9 and Compl. Ex. A. (a copy of the Interlocal Agreement).

> The Interlocal Agreement, and the ordinances adopted, respectively, by the individual Cities and the County pursuant thereto, collectively established the Broward Solid Waste Disposal District (the "District"). *See* Interlocal Agreement ¶ 5.1; *Coastal Carting*, 75 F.Supp.2d at 1352. The District was therefore comprised of twenty-four (24) separate entities: the twenty-three (23) incorporated municipalities---i.e., the Cities; and the twenty-fourth entity, which was the County itself. *See Coastal Carting*, 75 F. Supp.2d at 1352. Importantly for addressing the merits of the County's Motion to Dismiss, the County assumed its various obligations under the Interlocal Agreement in two distinct capacities: (1) the County assumed some of its obligations as the representative of the unincorporated areas of the County, and (2) the County assumed other obligations as the County itself, that is, the political subdivision in which the Cities are situated. *See* Interlocal Agreement ¶ 1.5 ("the COUNTY is entering this Agreement both representing unincorporated County, a waste generation area with solid waste requiring disposal, and COUNTY, as the party assuming the obligation under this Agreement for the disposal of solid waste for the [Cities] as well as for the unincorporated County").

> The County, in the "Factual Background" section of its Motion to Dismiss, states that a twenty-fourth incorporated municipality subsequently elected to join the District, bringing the total number of entities comprising the District to twenty-five (25).

> The contractual rights and obligations created in the Interlocal Agreement are manifold. The Cities and the County agreed that  the County, either by itself

24

or by engaging independent contractors, would construct and maintain a "resource recovery system," which would include two new solid waste disposal facilities. *See* Interlocal Agreement ¶¶ 1.3, 1.4, and 2.17. The County financed the construction of these state-of-the-art disposal facilities by issuing bonds. *See* Compl. ¶ 6. The Cities and the County also agreed that the Cities and the County, acting as representative of the unincorporated areas, would adopt "flow control ordinances" directing that solid waste generated in their respective geographic areas be delivered to the designated facilities of the resource recovery system. *See* Interlocal Agreement ¶ 3.2.

The constitutionality, under the Commerce Clause of the United States Constitution, of the flow control ordinance passed by the County pursuant to the Interlocal Agreement---i.e., Broward, Fla., Ordinances 87-3 and 87-4 (March 10, 1987)— was the subject of *Coastal Carting*; this Court held that those ordinances unconstitutionally discriminated against interstate commerce. *See Coastal Carting*, 75 F.Supp.2d at 1357.

To ensure that the County would be able to meet its financial obligations associated with the bond issuance, as well as its other obligations under the Interlocal Agreement, the Cities and the County-again, acting as representative of the unincorporated areas-also agreed, inter alia, that they would include in any contracts between them and solid waste haulers a provision requiring all solid waste hauled under such contracts to be delivered to designated disposal facilities within the resource recovery system. *See* Interlocal Agreement ¶ 3.3. To avoid ambiguity regarding whom such hauling contract provisions were intended to benefit, the Interlocal Agreement provides that "[t]he COUNTY will be a third party beneficiary" of such provisions. *See* Interlocal Agreement ¶ 3.3. In essence, therefore, the County itself is intended to be the "third party beneficiary" of the contracts it signs, as the representative of the unincorporated areas, with solid waste haulers.

The import of all of this is made clearer by Articles 5, 6 and 7 of the Interlocal Agreement, which relate, respectively, to the following: the creation of the Resource Recovery Board (the "RRB"); the setting and charging of "tipping fees" and service charges; and the collection of tipping fees. *See* Interlocal Agreement Art. 5, 6 and 7.  *See* Interlocal Agreement ¶¶ 2.16, 5.1.

The RRB, as the governing body of the District, adopts and revises the tipping fees that solid waste haulers are charged for delivering solid waste to the disposal facilities of the resource recovery system. *See* Interlocal Agreement ¶ 6.1. While the RRB sets the amount of tipping fees haulers are to be charged, under the Interlocal Agreement it is the County, as the County itself,

that bills haulers and collects the tipping fees. *See* Interlocal Agreement ¶ 7.1. The Interlocal Agreement further provides that the Cities and the County, as representative of the unincorporated areas, will include in any contracts with haulers provisions requiring the haulers to pay tipping fees to the County, and that "the COUNTY shall be a third party beneficiary of such provision." *See* Interlocal Agreement ¶ 7.5. Once again, the County itself is the "third party beneficiary" of contracts the County, acting as representative of the unincorporated areas, enters into with haulers.

The express purpose of the Interlocal Agreement can be summed up as follows. The County agreed to construct two state-of-the-art solid waste disposal facilities-and incur the indebtedness associated with that project, in the form of its bond issuance-in exchange for the pledge of the Cities, and the County as representative of the unincorporated areas, to guarantee the County a revenue stream of tipping fees by including provisions appropriate to this purpose in any contracts they sign with solid waste haulers. Paragraph 1.4 of the Interlocal Agreement states:

> It is recognized by [the Cities] and COUNTY that the proposed resource recovery system to be constructed, operated, maintained and repaired by the COUNTY ... will be done in reliance upon the existence of the committed flow of solid waste from [the Cities] and unincorporated County and the revenue generating capabilities of [the District] created herein.

*BFI Waste,* 209 F.R.D. 509, 510-12 (S.D. Fla. 2002).

Moreover, in *BFI Waste*, Judge Gonzalez stated that the arrangement met a stumbling block by virtue of his earlier decision in *Coastal Carting*. He further explained:

> In the wake of this Court's Coastal Carting decision, the Cities and the County took several steps. First, on May 21, 1999, the Cities and the County amended the Interlocal Agreement. *See* Compl. ¶¶ 32-33 and Ex. E. In one of the "Whereas" clauses prefacing the amendment to the Interlocal Agreement, the text refers specifically to this Court's decision in *Coastal Carting* and the Supreme Court's decision in *C & A Carbone, Inc. v. Town of Clarkstown*, 511 U.S. 383, 114 S.Ct. 1677, 128 L.Ed.2d 399 (1994) upon which this Court in part based its ruling in *Coastal Carting*, and then states as follows:

>> [i]t is the intent of this amendment to require the parties to the Interlocal Agreement to conform the laws and rules governing

26

> [the District] to the case law regarding flow control and remove all barriers, restriction, impediments and regulations of whatever nature from any solid waste generated in Broward County which is destined for disposal outside of the State of Florida. Compl. Ex. E at 1. The amendment revised paragraph 3.3 of the Interlocal Agreement to provide the following:

> Each party agrees to include in any contract or contract amendments with haulers executed after the date of execution hereof, a provision that all solid waste shall be delivered to the resource recovery system transfer or disposal facility or facilities designated in the plan of operations and to enforce such provision, with the exception of waste generated in Broward County which is shown to be destined for transportation to any destination outside of the State of Florida.

Compl. Ex. E at 2 (emphasis added). The RRB adopted an analogous revision to the Plan of Operations on March 19, 1999. *See* Compl. Ex. F. at 1.

On July 13, 1999, the County amended Ordinance 87-4, one of those comprising its flow control ordinance found to be unconstitutional in Coastal Carting. *See* Compl. ¶¶ 29-31 and Ex. D. Analogously to the amendment to the Interlocal Agreement, one of the "Whereas" clauses prefacing the amendment to the County's flow control ordinance states:

> Even though the County disputes the Court's findings, in an effort to avoid future litigation which challenges the validity of flow control ordinances adopted by the County and the [Cities], it is the intent of this amendment to conform the laws and rules governing [the District] to the case law regarding flow control and to remove all barriers, restrictions, impediments and regulations of whatever nature from any solid waste generated in Broward County which is destined for disposal outside of the State of Florida ...

Compl. Ex. D at 1-2. The amendment recites the original content of the ordinance, that is, "the County on behalf of the unincorporated area of Broward County, Florida, hereby directs that all solid waste generated within the unincorporated area of the county be delivered to the resource recovery system transfer or disposal facility of facilities designated in the plan of

operation under the Interlocal Agreement ..." *See* Compl. Ex. D at 2. The amendment then states:

> Waste generated in Broward County which is shown to be destined for transportation to any destination outside of the State of Florida based upon a sworn affidavit of a hauler delivered to the County reciting facts which evidence the transportation and disposal of waste outside the State of Florida is excluded from the flow restrictions contained herein.

Compl. Ex. E at 3. The amendment also provides that the County "will confirm [sic] the terms and conditions of any agreement it may have with a hauler of solid waste to the terms and conditions of the Interlocal Agreement." Compl. Ex. E at 3.

Therefore, what is important in the present case is that in 1999, the Plan of Operation was substantially amended. The Fifth Amendment to the Interlocal Agreement dated May 21, 1999, amended Section 3.3 to provide an exception for any waste generated in Broward County which is shown to be destined for transportation to any destination outside the State of Florida.  Likewise, in 1999, the Plan of Operation was amended to provide that "[w]aste generated in Broward County which is shown to be destined for transportation to any destination outside of the state of Florida ... is excluded from the flow control restrictions contained herein." Section I(B) of the Plan of Operations makes clear that it applies to all solid waste generated in the District, including C&D.

Even though Plaintiffs acknowledge that the Plan of Operations and Interlocal Agreement provide for an out-of-state exception, Plaintiffs claim without basis in the record sufficient for summary judgment, that the exception is "illusory and pretextual."[26] They claim

---

[26] Notably, Plaintiffs do not support this argument with any facts in the form of affidavits, declarations, discovery responses, or depositions to demonstrate that they, or anyone else,

that Defendants' actions constitute economic protectionism and that the Defendants discriminate by requiring the "Materials" to be delivered to and processed at local privately-owned facilities and by-hoarding the "Materials and byproducts." As discussed below, Plaintiffs lack standing to raise this argument because neither Plaintiff has sought, let alone been denied, the right to move the "Materials" out-of-state. Rather, Southern Waste and Sun  simply want to prevent the hauled commercial C&D from ending up in some other District landfill other than Suns.  But, even if Plaintiffs had standing, they have patently failed in their attempt to unearth purported proof for this argument for summary judgment purposes.  Simply stated, Plaintiffs have failed to present any evidence of any hauler that attempted to take C&D out-of-state and was prevented from doing so by any Defendant. Nor is there any evidence that the Interlocal Agreement and Plan of Operations somehow preclude waste generated outside of the State of Florida from being disposed of at facilities within the District.  Nothing on the face of the Plan of Operations, or from any evidence presented, sufficiently establishes that the financial or administrative burdens imposed on waste hauled out-of-state will be difficult to meet, or that such requirements were imposed to prevent waste from being transported out-of-state in a manner different from those haulers who dispose of waste at the Resource Recovery Facilities in the District in a proper and safe manner.

---

have been prevented from utilizing the out-of-state exception of the Plan of Operations or that the reporting requirements contained in the regulations constitute differential treatment of interstate interests that burden interstae commerce and benefit local interests. The only evidence in the record supports that the reporting requirements apply equally to instate and out-of-state haulers. These reporting requirements are the only way the District ensures that waste is either being disposed of out-of-state or at the Resource Recovery Facility, landfills or alternative facilities designated in the Plan of Operations, and not at facilities located elsewhere in Florida.

Moreover, the Plaintiffs have not attempted to transport waste outside of the State of Florida;  have never been prevented by any Defendant from doing so, and have not shown that the reporting requirements included in the Plan of Operations preclude them from doing so. Plaintiffs' arguments dealing with out-of-state reporting requirements have no bearing on the causation of Plaintiffs' alleged injuries by the District or the City. I conclude that Plaintiffs' arguments that the District is not entitled to summary judgment if the District "integrally participated" in the acts causing the alleged violations under § 1983 patently lacks factual basis in the record presented on summary judgement and does not create a material issue of fact.  Moreover, Plaintiffs' other argument (as it pertains to Sun) that Sun is no longer an "alternative facility" and that there are no current "alternative facilities" because none of the facilities complied with Section I(c)(1)-(3), and that the Plan of Operations now only designates the BIC and Central Disposal Landfill to receive C&D is another patent misreading of the Plan which blatantly ignores the uncontested and undisputed facts of record.

### C.  **Per Se Analysis Applied to the District's Interlocal Agreements and its Plan of Operation**

During the course of this litigation, the Supreme Court decided *United Haulers Ass'n v. Oneida-Herkimer Solid Waste Mgmt. Auth.*, 550 U.S. 330, 127 S.Ct. 1786, 167 L.Ed.2d 655 (2007), which has direct impact on this case. In *United Haulers*, the Court held that county flow control ordinances that required all waste be delivered to facilities owned and operated by a state-created public benefit corporation, and that treated all in-state and out-of-state private haulers the same, do not discriminate for purposes of dormant Commerce Clause. *Id.* at 1790. The facts in *United Haulers* were explicitly distinguished

from the facts found in *Carbone*, which, in contrast to the former, involved a private business entity receiving the favored local benefits. *See Carbone*,  511 U.S. at 387, 114 S.Ct. 1677. Thus, under this public-private distinction a state or municipality will not be subject to *per se* invalidity if the ordinance requires both local and out-of-state haulers to deliver all waste to a publically owned facility.

The United States Supreme Court further explicated its decision in *United Haulers* in *Department of Revenue of Kentucky v. Davis*, 553 U.S. 328, 128 S. Ct. 1801 (2008). The Court there stated:[27]

> Our most recent look at the reach of the dormant Commerce Clause came just last Term, in a case decided independently of the market participation precedents. *United Haulers*, supra, upheld a "flow control" ordinance requiring trash haulers to deliver solid waste to a processing plant owned and operated by a public authority in New York State. We found "[c]ompelling reasons" for "treating [the ordinance] differently from laws favoring particular private businesses over their competitors." *Id.,* at ----, 127 S.Ct., at 1795. State and local governments that provide public goods and services on their own, unlike private businesses, are "vested with the responsibility of protecting the health, safety, and welfare of [their] citizens," *ibid.*, and laws favoring such States and their subdivisions may "be directed toward any number of legitimate goals unrelated to protectionism," *id.*, at ----, 127 S.Ct., at 1796. That was true in *United Haulers*, where the ordinance addressed waste disposal, "both typically and traditionally a local government function." *Id.*, at ----, 127 S.Ct.,

---

[27]
.
The Supreme Court further clarified the distinction between *United Haulers* and *Carbone* by stating: "In so holding, we distinguished our decision in *C & A Carbone, Inc. v. Clarkstown*, 511 U.S. 383, 114 S.Ct. 1677, 128 L.Ed.2d 399 (1994), which struck down a very similar ordinance on Commerce Clause grounds. The *Carbone* ordinance, however, benefitted a private processing facility, and we found "this difference constitutionally significant" for the reasons adverted to in the main text. See *United Haulers*, 550 U.S. at ----, 127 S.Ct., at 1790. Although the *Carbone* dissent argued that the private facility was "essentially a municipal facility," 511 U.S., at 419, 114 S.Ct. 1677 (opinion of SOUTER, J.), United Haulers relied on the apparent view of the *Carbone* majority that the facility was properly characterized as private, see 550 U.S., at ---- - ----, 127 S.Ct., at 1793-94." *Id.* at 128 S.Ct. at 1809 n.8.

31

at 1796 (quoting *United Haulers Assn., Inc. v. Oneida-Herkimer Solid Waste Management Authority*, 261 F.3d 245, 264 (C.A.2 2001) (Calabresi, J., concurring); internal quotation marks omitted). And if more had been needed to show that New York's object was consequently different from forbidden protectionism, we pointed out that "the most palpable harm imposed by the ordinances-more expensive trash removal-[was] likely to fall upon the very people who voted for the laws," rather than out-of-state interests. *United Haulers*, 550 U.S., at ----, 127 S.Ct. at 1797. Being concerned that a "contrary approach ... would lead to unprecedented and unbounded interference by the courts with state and local government," *id.*, at ----, 127 S.Ct., at 1796, we held that the ordinance did "not discriminate against interstate commerce for purposes of the dormant Commerce Clause," *id.*, at ----, 127 S.Ct., at 1795.

....

It follows a fortiori from *United Haulers* that Kentucky must prevail. **In *United Haulers*, we explained that a government function is not susceptible to standard dormant Commerce Clause scrutiny owing to its likely motivation by legitimate objectives distinct from the simple economic protectionism the Clause abhors. *See id.*, at ----, 127 S.Ct., at 1796 ("Laws favoring local government ... may be directed toward any number of legitimate goals unrelated to protectionism"); *see also id.*, at ----, 127 S.Ct., at 1796 (noting that "[w]e should be particularly hesitant to interfere ... under the guise of the Commerce Clause" where a local government engages in a traditional government function).** (Emphasis added).

*United Haulers* is controlling precedent here as applied to the District's Interlocal Agreement and Plan of Operations. The District is performing a government function. In performing its governmental function, the Interlocal Agreements and Plan of Operation do not favor instate haulers. To the contrary, both explicitly grant an exemption for waste being transported interstate, while leaving no such exemption for waste being transported intrastate. Consequently, they do not discriminate against interstate commerce under the *per se* prong.

Even if it could be shown by Plaintiffs, which it has not, that the District is a "market-

participant,"[28] that is, it somehow is seeking to favor one private landfill over other private landfills in Broward, because it purportedly has a financial interest in the Broward Interim Contingency Landfill,  and is thereby attempting to affect the local market,  it, as a government entity, is not subject to the restraints of the Commerce Clause.[29]  The Supreme Court reaffirmed this exception in *Davis,* as follows:

> Some cases run a different course, however, and an exception covers States that go beyond regulation and themselves "participat[e] in the market" so as to "exercis[e] the right to favor [their] own citizens over others." *Alexandria Scrap*, 426 U.S., at 810, 96 S.Ct. 2488. This "market-participant" exception reflects a "basic distinction ... between States as market participants and States as market regulators," *Reeves*, 447 U.S., at 436, 100 S.Ct. 2271, "[t]here [being] no indication of a constitutional plan to limit the ability of the States themselves to operate freely in the free market," *id.*, at 437, 100 S.Ct. 2271 . *See also White v. Massachusetts Council of Constr. Employers, Inc.*, 460 U.S. 204, 208, 103 S.Ct. 1042, 75 L.Ed.2d 1 (1983) ("[W]hen a state or local government enters the market as a participant it is not subject to the restraints of the Commerce Clause"). Thus, in *Alexandria Scrap*, we found that a state law authorizing state payments to processors of automobile hulks validly burdened out-of-state processors with more onerous documentation

---

[28]

For the same reasons related to the District, *United Haulers* would equally apply to the City of Coral Springs because its Ordinance and Franchise Agreement does no more than require compliance with the District's Interlocal Agreement and Plan of Operation. Independent of the approach taken in the Eleventh Circuit's *Dania Beach* case, the City, also performing a government function, would not be susceptible to standard Dormant Commerce Clause scrutiny owing to its likely motivation by legitimate objectives distinct from the simple economic protectionism the Clause abors. However, I do not reach the issue of whether the City of Coral Springs is a "market participant." By way of *dicta*, I find that it is not, but rather functions as a "government regulator."

[29]

Plaintiffs claim that the Defendants have not only discriminated against the interstate market for processing C&D, but also for the C&D itself. They claim that the City is granting the Landfill, a privately-owned local facility, the exclusive right to the Materials to the detriment of all consumers in other countries, States and Nations. The record, however, is devoid of any evidence regarding the amount of C&D generated in Coral Springs or the District that is delivered to a landfill versus a recycling facility. Plaintiffs have not submitted any proof that a larger amount of C&D would be recycled rather than be placed in a landfill in absence of the Interlocal Agreement and Plan of Operations.

requirements than their in-state counterparts. Likewise, *Reeves* accepted South Dakota's policy of giving in-state customers first dibs on cement produced by a state-owned plant, and *White* held that a Boston executive order requiring half the workers on city-financed construction projects to be city residents passed muster.

### D. **Plaintiffs Standing to Raise Commerce Clause Issues**

I return to whether Southern Waste and Sun have standing to challenge the "regime" of regulations at issue. The standing analysis consists of constitutional and prudential components. "To meet the constitutional standing requirement, a plaintiff must show (1) an injury in fact (2) that is fairly traceable to the actions of the defendant and (3) that likely will be redressed by a favorable decision." *Procter & Gamble Co. v. Amway Corp.*, 242 F.3d 539, 560 (5th Cir. 2001) (citing *Bennett v. Spear*, 520 U.S. 154, 117 S.Ct. 1154, 1161, 137 L.Ed.2d 281 (1997); *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 112 S.Ct. 2130, 2136, 119 L.Ed.2d 351 (1992)).

I conclude that Southern Waste has constitutional standing  under the Third Amended Complaint to claim that both the Franchise Agreement and the City Ordinances violate the Dormant Commerce Clause because: (1) Southern Waste is legally excluded from collecting commerical C&D as a result of the both the Agreement and Ordinance, and thereby is legally precluded from competing with Waste Management in Coral Springs for commerical C&D, and (2) potentially would be subject to a fine or criminal violation for collecting commerical solid waste in violation of the Agreement and Ordinances.  I reach this conclusion with some pause because, as a practical matter, Southern Waste has chosen to ignore the Franchise Agreement and Ordinance and collect commerical C&D in violation of both and, to date, apparently has done so without apparent consequence.

Nonetheless, I conclude that Southern Waste has sufficiently demonstrated that it has been, and in the immediate future, can be harmed by the challenged Franchise Agreement and Ordinance.  Otherwise stated, Southern Waste has an injury (lack of legal right to collect commercial C&D) that is traceable to the Franchise Agreement and Ordinance and which would be remedied if I rule that the Franchise Agreement and Ordinance violate the Dormant Commerce Clause.

The more difficult question is whether both Plaintiffs meet the prudential standing requirements. The goal of the prudential standing requirements is to "determine whether each plaintiff 'is a proper party to invoke judicial resolution of the dispute and the exercise of the court's remedial powers.'" *Procter & Gamble*, 242 F.3d at 560 (quoting *Bender v. Williamsport Area Sch. Dist.*, 475 U.S. 534, 106 S.Ct. 1326, 1334 n. 8, 89 L.Ed.2d 501 (1986)).

> "These judicially created limits concern whether a plaintiff's grievance arguably falls within the zone of interests protected by the statutory provision invoked in the suit, whether the complaint raises abstract questions or a generalized  grievance more properly addressed by the legislative branch, and whether the plaintiff is asserting his or her own legal rights and interests rather than the legal rights and interests of third parties." *Procter & Gamble*, 242 F.3d at 560.

The key inquiry for prudential standing as to the District's regulations in this case is whether the injury of which the Plaintiffs complain is "arguably within the zone of interests to be protected" by the dormant Commerce Clause, the "constitutional guarantee in question" here.  *Ass'n of Data Processing Serv. Orgs., Inc. v. Camp*, 397 U.S. 150, 90 S.Ct. 827, 830, 25 L.Ed.2d 184 (1970). *See also Boston Stock Exch. v. State Tax Comm'n*, 429 U.S. 318, 97 S.Ct. 599, 603 n. 3, 50 L.Ed.2d 514 (1977) (applying the zone of interests test

in the context of the dormant Commerce Clause). The facts of this case require that I analyze the zone-of-interest question in two parts: I must determine whether plaintiffs have standing to challenge the flow control ordinances as being facially discriminatory against out-of-state economic interests, or whether they can merely challenge the District's Interlocal Agreement and Plan of Operations as being excessively burdensome to interstate commerce.  In this regard, I conclude that Southern Waste and Sun lack prudential standing to facially challenge the District's Interlocal Agreement and Plan of Operations as being in violation of the Dormant Commerce Clause because neither regulation acts to prohibit Southern Waste or Sun from collecting C&D in any municipality, nor has the District taken any steps to prevent Southern Waste and Sun from hauling and processing C&D from any city in the District.  *See Seacoast Sanitation, Ltd. v. Broward County,* 275 F.Supp.2d 1370, 1377-78 (finding no standing where a plaintiff is "utterly unaffected" by the flow control ordinance for the unincorporated parts of Broward County).  Plaintiffs have taken the curious position that not one of their witnesses or even their "experts" can provide competent or admissible testimony on the question of whether the District has caused Plaintiffs any injury (Plaintiffs' Opp. at p. 4-6). Even Plaintiffs' president and chief operating officer did not know in his deposition of any injury.[30]

Plaintiffs posit that the District's documents "facially" discriminate against interstate

---

[30]

Plaintiffs' "expert" Donald Freedland was the former interim executive director of the District. He acknowledged that cities and haulers of construction and demolition debris in the District had the choice under the Plan of Operations to send the construction and demolition debris to a number of C&D facilities, including Sun's facilities. Mr. Freedland acknowledged that the District allows cities to either be open (not have any franchise) or closed (having an exclusive franchise) for construction and demolition debris collection, and that open cities are not violating any District rule or regulation.

commerce. But, they support their claim with two arguments regarding "effects," rather than facial discrimination. Here, the record fails to demonstrate that in-state economic interests were favored over out-of-state interests. In fact, the opposite is true, the only preferential treatment that the regulations bestows is to in-District operators, such as Sun, as opposed to other Florida operators, which "does not constitute discrimination against interstate commerce. *See IESI AR Corp. v. Northwest Regional Solid Waste Management District, 433 F.3d at 605.*

Significantly, neither Plaintiff can point to any evidence showing that the Interlocal Agreement or Plan of Operations discriminates against out-of-state interests when each facially provides that C&D collected in the District may be taken to landfills out-of-state. These Plaintiffs do not ship C&D out-of-state. They have no immediate plans to do so in the near future.  All Sun can claim is that it has customers who purchases materials that it sells to those who then may place the materials in interstate or foreign commerce.  In sum, there is  no injury causally connected to any regulation of the District.

Moreover, the Plaintiffs arguments on standing strain credibility.  If Sun is successful as to the District's regulations only in establishing a violation of the Commerce Clause, then its own receipt of non-commercial solid waste from Coral Springs, and the combined residential and commercial waste from other District cities under the District's Plan of Operations, would be implicated as being in violation of the Commerce Clause.  Sun is not before this Court encouraging more competition from out-of-state or intra-state competitors. Sun simply cannot have it both ways.[31]

---

[31]

Plaintiffs contend that "[t]he City's actions are precluding materials generated in the City

I find no material facts in dispute regarding Sun's facilities.[32]  Sun facilities have been designated in the Plan of Operations as alternative facilities for each and every one of the Revisions to the Plan of Operations in effect during this litigation.  Revisions Twelve through Fourteen listed two Sun facilities located in Pompano Beach and Dania Beach as Alternative Facilities for Unprocessable Waste.  Specifically, under Revision 13 of the Plan of Operations which was adopted in December 2006 (and prior versions from 1999 onward), C&D collected in the District, including Coral Springs, could be delivered to the geographically designated landfills, specially listed alternative facilities, and any other licensed facility in Florida, for facilities outside of Florida.  Under Revision 14 of the Plan of Operations (adopted on January 17, 2008), C&D collected in the District, including Coral Springs, could be delivered to the geographically designated landfill, specifically listed alternative facilities, any other licensed facility in Broward County, or facilities outside of Florida; this included Sun's facilities in Dania and Pompano Beach.  Moreover, under

_____

from being processed out of the State" because "the City is using its leverage in the collection and disposal markets to exert a regulatory effect in the processing market by requiring Waste Management to dispose of the materials at the processing facilities designated in the Plan, which are only located in Broward County." This contention is not supported by the record on summary judgment.  Just because the Plaintiffs' expert may say so, it does not make it so or create a material issue of fact.  There is nothing in the Franchise Agreement which prevents the delivery of solid waste, including C&D collected in Coral Springs, to a location outside the State of Florida.

[32]

Plaintiffs contend that no alternative facilities exist under the Plan of Operations because none agreed to the conditions which set forth reporting requirements and inspections for alternative facilities. The record is devoid of any evidence that an alternative facility has been de-listed or threatened with de-listing for non-compliance. Rather, the evidence establishes without material dispute that all the alternative facilities listed in the Plan of Operations, including Sun's facilities, continue to be and have always been approved facilities for the processing and disposal of construction and demolition debris.

Revision 15 of the Plan of operations (adopted in June 2008), C&D collected in the District, including Coral Springs, can be delivered to the geographically designated landfill, specifically listed alternative facilities or facilities outside of Florida.[33]  I reemphasize that the Plan of Operation specifically provides that waste "shown to be destined for transportation to any destination outside the State of Florida" is excluded from the limitations contained in the Plan of Operations.  This out-of-state provision removes this case from *Carbone* and *Coastal Carting*.

The fact that the District's regulations may discriminate intrastate does not change the result (assuming the Plaintiffs had standing even to raise the issue given that neither has facilities, or desires to send C&D to facilities, instate, or that any instate hauler desires to send C&D to Broward).[34]  Courts have consistently held that flow control ordinances which prohibit intrastate disposal of waste but allow interstate disposal of waste do not discriminate against interstate commerce. *See IESI AR Corp. v. N.W.Ark.Reg'l Solid Waste Mgmt. District*, 433 F.3d 600, 602-03 (8th Cir. 2006); *BenOehrleins,* 115 F.3d at 1387; *Waste Management of Michigan v. Ingham Country*, 941 F.Supp. 656, 666 (W.D. Mich 1966); *Vince Refuse Service, Inc. v. Clark County Solid Waste Management District*, 1995 WL 253121, *9 (S.D. Ohio March 7, 1995).

Here, the  only preference is granted to designated facilities, like Sun, as a local

---

[33]

The current revision of the Plan of Operations goes further and designated Sun #1 (Pompano Beach), Sun #2 (Dania Beach), Sun #7 (Deerfield Beach), and Sun #8 (Deerfield Beach) as Alternative Facilities for Unprocessable Waste and C&D.

[34]

Nothing in the District's regulations prohibits, for instance,  waste collected in the District from being transported through any other county in Florida. Here, either the C&D, or its recycled components, can be placed in interstate commerce.

operator. This may create a monopoly at the local level, but as long as the waste is allowed to flow freely in or out of the State, there is no discrimination against interstate commerce. It is simply not the kind of "economic protectionism" that the Commerce Clause is intended to prevent.  A purely intrastate flow control regulation may be "protectionist" but it is only so at the local level.  If anything, such a flow control regulation treats interstate commerce more favorably than intrastate commerce.

While Southern Waste and Sun claim that Sun's customers ship the C&D in interstate and foreign commerce, such tenuous "indirect" connections do not place Plaintiffs within the protected zone-of-interest required to have the prudential standing necessary to bring this action. The Plaintiffs are merely local companies which do not ship, or contract to with others to ship, out-of-state much less out of the United States to foreign countries. Nothing prevents Southern Waste or Sun from disposing of the C&D out-of-state under the District's Plan of Operations and Interlocal Agreement, either before or after the processing. There is no claim that Sun owns facilities in other counties and is being precluded from receiving solid waste as a result of the District rules and regulations. As such, I decline to expand the zone-of-interest protected by the Commerce Clause to purely intra-county (let alone intrastate) disputes. I hold that because Southern Waste and Sun's injuries are not even "marginally related" to the interests the Commerce Clause seeks to protect and safeguard, they lack prudential standing to bring the federal constitutional claims at issue.

### E. Standing to Claim an Excessive Burden on Interstate Commerce

I next consider whether Plaintiffs nonetheless have standing to challenge the flow control ordinances on the basis of the claim that they excessively burden interstate commerce.  Here, Plaintiffs are not directly involved in interstate commerce.  Nothing in the

40

record on summary judgment creates any issue of material fact on this point.  Moreover, Plaintiffs point to no direct contracts with interstate customers which are burdened by the District's regulations.  Accordingly, I conclude that Plaintiffs do not meet the zone-of-interests test in this regard as well, and thus lack standing to challenge the District's regulations as to their burden on interstate commerce.

### F. *Pike* Balancing Test

While I conclude that the Plaintiffs lack standing as to the District regulations, I address the merits in any event under the *Pike* analysis in the event I am wrong under both prongs of the standing issue.  Although the Interlocal Agreement and Plan of Operation do not overtly discriminate against interstate commerce they may still violate the Commerce Clause if their incidental burdens on interstate commerce outweigh their benefits conferred upon the locality.  *Pike*, 397 U.S. at 142, 90 S.Ct. 844. Plaintiffs bear the initial  burden of demonstrating that the Plan of Operations and the Interlocal Agreement have a discriminatory effect on interstate commerce. *Cherry Hill Vineyard, LLC v. Baldacci*, 505 F.3d 28, 33 (1st Cir. 2007) ('[t]he initial burden of [proving] discrimination rests with the challenger").[35] Plaintiffs have failed to meet their initial burden.

---

[35] In *Cherry Hill,* the First Circuit held that the plaintiffs had not proffered any evidence that the challenged laws had any discriminatory effect on interstate commerce and that to maintain their claim they were required "to submit some probative evidence of adverse impact." Id. at 505 F.3d at 36. Here, Plaintiffs have failed to sufficiently demonstrate how local economic actors are favored by the legislation, and how out-of-state actors are burdened by the legislation. Plaintiffs have failed to demonstrate how the District's regulations discriminates among similarly situated in-state and out-of-state interests, or how those regulations have the effect of providing a competitive advantage to in-state vis-a-vis similarly situated out-of-state interests. As explained at length in this Order, there is no evidence that any hauler has been prevented from hauling construction and demolition debris generated in Coral Springs outside the State of Florida, or that any out-of-state

Here, Plaintiffs do not complain of any direct infringement. Rather, Plaintiffs' Dormant Commerce Clause arguments (presumably under the *Pike* analysis) are based on the allegation of the "incidental burden" that the materials they deal in are "ultimately bound for interstate and/or foreign commerce," and that the material is delivered "to Southern Waste for further delivery to Sun Recycling, where it is processed and shipped directly or indirectly, used in interstate and/or foreign commerce." (Third Am. Compl. ¶¶ 9, 17).

Plaintiffs posit that the City Ordinance, the Franchise Agreement, the Plan of Operations and the Interlocal Agreement have a "practical effect" on interstate commerce by prohibiting "the Materials" from being processed at any facility other than the privately-owned, local facilities designated in the Plan; and by prohibiting the Materials from entering the stream of interstate commerce both before and after they are processed. Plaintiffs claim that the Defendants accomplish the alleged discrimination in three ways: (1) the City of Coral Springs locks up the collection of the Materials though implementation and enforcement of the Ordinance; (2) Waste Management then collects the locked-up materials and delivers them to the facility designated in the Plan-the Landfill-which is privately-owned by Waste Management and located in Broward County; and (3) the District drafted and continues to modify the Plan of Operations to ensure that the Materials go to the specifically designated facilities rather than the "Alternative Facilities" or to out-of-state facilities, and polices the activities of the City and Waste Management to ensure compliance with the goals of the Interlocal Agreement and the terms of the Plan of Operations. I

---

facility has been denied access to construction and demolition debris from Coral Springs. Nor is there any evidence of any increased costs or fees imposed on out-of-state interests by Defendants.

conclude that none of these arguments have legal merit.

First, the record on summary judgment does not support Plaintiffs' contentions. Plaintiffs have made no effort to show that the amount of recyclable materials generated in the City or the District, which may enter interstate commerce, were reduced as a result of the Exclusive Franchise Agreement, the Ordinance, Interlocal Agreement and/or the Plan of Operations.

Second, even though the Plaintiffs refer to the "Regime" of interrelated regulation, the District does not and cannot require the City or any municipality to have an exclusive franchise agreement. Fla. Stat. § 403.706(3)(stating that "[n]othing in a count's solid waste management or recycling program shall affect the authority of a municipality to franchise or otherwise provide for the collection of solid waste generated within the boundaries of the municipality."). Thus, each city may independently decide whether to have a franchise and which aspects of the waste system to include in such franchises. The Franchise Agreement here is simply not interrelated to any policy or rule of the District.

Third, there is no discriminatory effect here because there is no indication that in-state economic interests were favored over out-of-state interests. The Plaintiffs have failed to establish for summary judgment purposes that the intercounty waste restrictions either facially or in practical effect discriminate against interstate or foreign commerce. Even at best, if Plaintiffs could establish that the flow control regulations were protectionist as to other waste processing facilities within the state, it only establishes a discrimination against intrastate commerce which is not covered by the Dormant Commerce Clause.

Fourth, Plaintiffs claim that the Court should consider incidental burden in the aggregate. This approach has been properly rejected in *Quality Compliance Services v.*

*Dougherty County*, 553 F.Supp 2d. 1374, 1379 (M.D.Georgia 2008) where the plaintiff's expert (the very same expert Plaintiffs have in this case) offered an opinion of an aggregate theory of harm — stating that if similar flow control legislation were implemented more widely, the national market for waste disposal would be severely interfered with. The court there explained the precedent on the issue and I adopt and apply it here without further comment or analysis.

Fifth, the record is devoid of evidence that the Interlocal Agreement and Plan of Operations have the effect of increasing the cost associated with the processing or recycling of Commercial C&D in the District or in interstate or foreign commerce. *East Coast Recycling v. City of Port St. Lucie*, 234 F.Supp.2d 1259, 1266 (S.D.Fla. 2002).

In the event I am wrong on my analysis that the record on summary judgment fails to sufficiently establish incidental burdens on interstate or foreign commerce, I now address, again applying summary judgment standards, the *Pike* balancing test to determine whether the so-called "Regime" **excessively** burden interstate commerce. An "evenhanded" ordinance, i.e., one that does not facially discriminate against out-of-state interests and only incidentally affects interstate commerce, will be upheld unless the burden it imposes on interstate commerce is "clearly excessive in relation to the putative local benefits" of the ordinance. *Pike*, 90 S.Ct. at 847.  To make this assessment, I consider the nature of the local interest and whether alternative means could achieve that interest with less impact on interstate commerce: "If a legitimate local purpose is found, then the question becomes one of degree. And the extent of the burden that will be tolerated will of course depend on the nature of the local interest involved, and on whether it could be promoted as well with a

lesser impact on interstate activities." *Id.*

I first look for a legitimate public purpose that defendants intended to advance by implementing flow control. The Supreme Court has expressly found that waste collection, disposal and management are core traditional functions of local government. *United Haulers*, 550 U.S. at 344.   Defendants indeed have a legitimate local purpose: to ensure the economic viability of  landfills within the District and to protect and safeguard the public health and welfare. *See U & I Sanitation v. City of Columbus*, 205 F.3d 1063, 1070 (8th Cir.2000) (recognizing economic viability as a legitimate local purpose in the context of a waste flow control ordinance).  Indeed, the regulations give Broward County a convenient and efficient way to finance their integrated package of waste disposal service. And, "revenue generation," is a cognizable benefit for the purposes of the *Pike* test. *United Haulers*, 550 U.S. at 346.  I fail to find in this record that the District can promote the local benefits with a lesser impact on interstate commerce, particularly because the District directly allows for interstate hauling.

Next, I identify the burden imposed on interstate commerce. To succeed in a challenge to a regulation under the *Pike* balancing test, the challenging party must show that the regulation has "a disparate impact on interstate commerce." *Automated Salvage Transp., Inc. v. Wheelabrator Envtl. Sys., Inc.*, 155 F.3d 59, 75 (2d Cir.1998).  The "incidental burdens to which *Pike* refers are the burdens on interstate commerce that exceed the burdens on intrastate commerce." *Id.* (internal quotation and citation omitted).  "Where a regulation does not have this disparate impact on interstate commerce, then we must conclude that ... [it] has not imposed any incidental burdens on interstate commerce" and, therefore, that it passes

45

the *Pike* test. *Id*. (internal quotation and citation omitted).

Even if I assumed that the an unspecified amount of recycled materials do not end up in interstate commerce, I conclude that such an effect is slight and the means chosen to accomplish the putative local benefits are reasonably effective and not clearly excessive in relation to the legitimate goals of long-term solid waste disposal planning. Otherwise stated, safe and sanitary management of solid waste generated within the District which is conducted on a self-financing basis constitutes the kind of local benefits which are not clearly exceeded by any incidental burden on interstate commerce. This is particularly true in Florida where, since the 1970's, the Florida Legislature has issued a mandate requiring urbanized counties to prepare resource recovery and solid waste plans. *See* Florida Statutes § 403.706 (as then in effect). Here, the Interlocal Agreement and the Plan of Operations are critical components of Broward Country's comprehensive plan for long-term management of the County's solid waste by providing for a reliable solid waste management system that has, in turn, met the goals established by the Florida Comprehensive Plan adopted by the Florida Legislature in 1985 to deal with waste management, among other components.

But, here, I further conclude from the record on summary judgment that the flow control regulations do not have a disparate impact on interstate commerce, nor does any evidence of record materially establish that they do; consequently, plaintiffs fail in their attempt to show that the ordinances do not pass the *Pike* test. Even if Plaintiffs can point to a legitimate "disparate burden," which they have not, they have failed to demonstrate that the measures impose a burden on interstate commerce that is qualitatively or quantitatively different from that imposed on intrastate commerce; that is, that there are no incidental burdens on interstate commerce which exceed the burdens on intrastate commerce, and

burdens that are local or intrastate in nature are not relevant for Commerce Clause purposes because they do not affect interstate commerce.

Plaintiffs further appear to argue that interstate commerce is being burdened because they are being prevented from introducing recycled C&D into the stream of commerce. But, Plaintiffs do not ship any materials outside the State of Florida, and they do not have any customers outside the State of Florida. Plaintiffs have made no effort to quantify the alleged burden of materials being introduced into commerce.[36] The only evidence of an interstate burden is the effect on Sun's customers who ship interstate. Sun's theory is obscure. Sun appears to argue that  the flow control ordinances, because they will raise Sun's costs within the District and thereby make Sun's sales to customers who ship out-of-state relatively less competitive, impose a burden on Sun's interstate commerce by affecting the portion of business that may involve areas beyond Florida.  Furthermore, even if I assume for summary judgment purposes that the District's regulations have, in some manner, the effect of shifting some business away from plaintiffs, as the ordinances increase their costs and make them relatively less competitive, this result does not mean that the ordinances burden interstate commerce.

In sum, Plaintiffs have been unable to sufficiently articulate, let alone support for summary judgment purposes, that the Franchise Agreement either alone, or coupled with the District's Interlocal Agreement and Plan of Operations, imposes any extra burden on out-

---

[36] Plaintiffs claim, without record support, that the Plan of Operations requires the Materials to be taken to the Landfill. This assertion is contradicted by every single witness who has testified that haulers of C&D have the option of where to dispose of C&D collected in the District, including from Coral Springs, and those options include numerous recycling facilities, such as Suns.

of-state companies, or on local companies engaged in interstate commerce.  In light of this, I conclude that neither the City nor the District, either alone or in combination, have imposed any incidental burdens on interstate commerce that are clearly excessive in relation to the putative local benefits articulated by both the City, Waste Management and the District in their briefs on summary judgment; namely, that it is not in excess in relation to the purpose of developing and implementing jointly a comprehensive, environmentally advanced, solid waste disposal and resource recovery system to process solid waste generated within the District.

For the reasons stated, it is **ORDERED**:

1.    The motions for summary judgment by the Defendants Coral Springs (other than on  its counterclaim) **[DE 275]**; Waste Management **[DE 281]** and the District **[DE 288]** are **GRANTED**.

2.    The motion for summary judgment by the Plaintiffs Southern Waste and Sun **[DE 292]** is **DENIED**.

3.    Coral Springs' motion to strike **[DE 235]** is **DENIED AS MOOT**.

4.    Waste Management's motion to strike Plaintiffs' statement of material facts **[DE 337]** is **DENIED**.

5.    Waste Management's motions to strike the affidavits of Charles Lomangino **[DE 338]** and Anthony Lomangino **[DE 339]** are **GRANTED**.

6.    Dismissal of Count III of the Second Amended Complaint is now **GRANTED WITH PREJUDICE**.

7.    Final judgment shall be entered pursuant to Fed.R.Civ.P. 54(b) for the

Defendants and against the Plaintiffs on **[ DE 275, 281 and 288].**

8.    The City's motion for summary judgment on its counterclaim **[DE 275]** is

**DENIED**.  A trial on the City's counterclaim shall be held in abeyance pending

an appeal of the final judgment on summary judgments.

9.    This case is **ADMINISTRATIVELY CLOSED** pending a final determination on

any appeal. It may be reopened as to the counterclaim by motion of the City

or the Plaintiffs.

    **DONE AND ORDERED** in Chambers at Miami, Florida, on this 21st day of January

2010.


                                        _____
                                        THE HONORABLE ALAN S. GOLD
                                        UNITED STATES DISTRICT JUDGE

cc:
U.S. Magistrate Judge Chris M. McAliley
All counsel of record

49